**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LAURA PEARL WOODSBEY,** | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **1:14-CV-285-TFM** |
| **v.** | ) |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

July 7, 2015

### I.    Introduction

Laura Pearl Woodsbey ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), which denied her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §1381-1383(f). Pending before the Court are the parties' cross-motions for summary judgment (ECF Nos. 8,10), which have been fully briefed, and are ripe for disposition. For the reasons that follow, Plaintiff's motion will be **DENIED**, and the Commissioner's motion will be **GRANTED**.

### II.    Background

#### A.    Factual Background

Plaintiff was born on December 26, 1969, and was forty-one years old when she filed her current application for social security benefits. (R. 29). Plaintiff did not complete the ninth grade, and has a "dysfunctional" family background. (R. 56). At the time of the hearing, Plaintiff lived with her sister-in law. (R. 52). Plaintiff has also been incarcerated nine times for various charges

and has spent approximately eight years of her life in prison. (R. 607). Her most recent incarceration lasted twelve months and concluded in September 2011. (R. 53). The Administrative Law Judge ("ALJ") noted in his opinion that Plaintiff had received SSI in the past, but her eligibility for benefits was terminated as a result of her incarceration.[1] (R. 15).

### B. Relevant Educational, Medical, and Opinion Evidence

A psychological study of Plaintiff's cognitive function conducted in 1978, while Plaintiff was in the first grade, indicated that she displayed "mild mental retardation and inability to function in normal developmental curriculum." (R. 213). Plaintiff's IQ was 66. *Id.*

Treatment notes from Stairways Behavior Health, where Plaintiff underwent treatment for her mental impairments from May 2008 to November 2009, albeit inconsistently, showed that Plaintiff experienced mood swings and anxiety of fluctuating intensity. (*See e.g.*, R. 225, 231, 235). Gail Holland, D.O., a physician at Stairways, assigned Plaintiff a GAF Score of 45-50 in May 2008. (R. 257).

A psychological evaluation conducted by Byron Hillin, Ph.D., in April 2009 reflected that Plaintiff's full scale IQ was 72, demonstrating borderline intellectual functioning. (R. 263). Dr. Hillin noted that Plaintiff's Weschler Adult Intelligence Scale-III results indicated that she has below average intelligence in the areas of reasoning, math, spelling, and reading comprehension. *Id.* She was also classified as being "marginally literate." (R. 265). Dr. Hillin also found that Plaintiff's ability to maintain full-time employment was "very precarious," and he recommended that Plaintiff be limited to food service, cleaning or other "hands-on" work. *Id.*

---

[1] The Social Security Administration terminates a recipient's benefits after twelve consecutive months of benefit suspension for any reason, 20 C.F.R. § 416.1335, including residence as an inmate in a public institution. 20 C.F.R. § 415.1325(a) (defining suspension of benefits); 42 U.S.C. § 1382(e)(1)(A) (defining eligibility for benefits). A new application is needed to reestablish eligibility for the receipt of benefits following termination for non-disability reasons. *DI 280705.020 Reestablishing Title XVI Eligibility Following Suspension or Termination for Nondisability Reasons*, Social Security Administration, https://secure.ssa.gov/apps10/poms.nsf/lnx/0428075020 (last visited June 29, 2015).

Medical records from the Bureau of Prisons, generated from November 2010, to May 2011, during Plaintiff's term of incarceration, demonstrated that Plaintiff was generally "pleasant and cooperative." (R. 283). A physical and mental status examination conducted by Tiffany Sanders, M.D., in November 2010 indicated that Plaintiff had asthma, benign essential hypertension, psychosocial and environmental problems, but that she otherwise had normal mood and affect. (R. 318). Plaintiff's healthcare providers from the Bureau of Prisons evaluated her and assigned her a GAF score range from 51 to 70 on numerous occasions, (R. 274, 278, 294, 306, 318, 347), but on two occasions, she received a specific GAF score of 55. (R. 294, 347).

Cameron McGavin, M.D., evaluated Plaintiff for mental health issues from June to September, 2011, while she resided at Renewal, a half-way house. (R. 498, 525). Plaintiff reported that she was depressed and anxious, although Dr. McGavin suspected possible "malingering" and symptom magnification. (R. 520). During this period, Plaintiff also got a full time job at McDonald's, although she claimed the job increased the level of her anxiety and stress. (R. 504, 509). As a result, Dr. McGavin recommended that Plaintiff be excused from work for sixty days to address these issues. (R. 503). In September, 2011, Dr. McGavin assessed Plaintiff's GAF score at 40-45. (R. 502).

On November 18, 2011 Rebecca Billings, Ph.D., conducted a mental residual functional capacity ("MRFC") assessment and consultative psychological evaluation of Plaintiff. Dr. Billings opined that Plaintiff had slight limitations in her ability to interact appropriately with the public, her supervisors, and her co-workers, while she had marked limitations in her ability to respond appropriately to work pressures in a usual work setting, and moderate limitations in her ability to respond appropriately to changes in a routine work setting. (R. 612). Moreover, Dr.

Billings diagnosed Plaintiff with Bipolar II disorder, major depressive disorder, cocaine and alcohol dependence in full remission, personality disorder (not otherwise specified), and borderline intellectual functioning. (R. 611). Dr. Billings assigned Plaintiff a GAF score of 50 and noted a full scale IQ of 72. (R. 609, 611).

In December 2011, Manuella Link, Ph.D., a state agency psychological consultant, completed an MRFC assessment after review of Plaintiff's medical records. (R. 85). Dr. Link found that Plaintiff had the ability to meet the basic mental demands of sustained work. (R. 91). That same month, James Caramanna, M.D., performed a physical residual functional capacity assessment, in which he found that Plaintiff was capable of performing medium exertional work. (R. 88-89).

Plaintiff returned to Stairways Behavioral Health for psychological evaluations and check-ups from January 2012 to March 2013. (R. 644, 645). While there, Sean Su, M.D., and his colleagues treated Plaintiff for mood swings and anxiety, along with racing thoughts. In February 2013, Dr. Su assigned Plaintiff a GAF score of 50. (R. 651). He also assessed Plaintiff as "awake and alert," while her intelligence appeared around average, her memory was intact, and her affect was blunted. *Id.* Plaintiff described her mood as "up and down." *Id.*

On May 12, 2013, Dr. Su completed a medical source statement, in which he evaluated Plaintiff's mental impairments. (R. 661). Dr. Su opined that Plaintiff had extreme limitations in her ability to make judgments on simple, work-related decisions, moderate limitations in her ability to understand, remember, and carry out detailed instructions, and slight limitations in her ability to understand, remember, and carry out short, simple instructions. *Id.* Dr. Su also opined that Plaintiff had extreme limitations in her ability to interact appropriately with the public, supervisors, and co-workers, and had similarly extreme limitations in her ability to respond to

work pressures in a usual work setting. (R. 662). Dr. Su found that Plaintiff would likely call off from work five out of five days in the work week, and would need more than nine breaks during the workday. (R. 663). Dr. Su based these findings solely on Plaintiff's "extremely unstable mood." *Id.*

### C.  Procedural History and Opinion of the Administrative Law Judge

Plaintiff applied for SSI on September 7, 2011, alleging disability since October 1, 2005, and claiming that she suffered from major depression, schizophrenia, post-traumatic stress disorder, and heart disease. (R. 81, 161). The agency denied Plaintiff's application. (R. 80). She thereafter requested an administrative hearing, which was held on June 6, 2013. (R. 104). An ALJ heard testimony from Plaintiff and a vocational expert. (R. 45). Plaintiff's counsel had the opportunity to question the vocational expert at the hearing. (R. 76).

The ALJ subsequently issued his opinion, explaining his decision to deny Plaintiff's application for social security benefits. At Step One the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date. (R. 17). At Step Two of the analysis, the ALJ concluded that Plaintiff had the following severe impairments:

> gastroesophageal reflux disease (GERD), obesity, cervical degenerative disc disease, lumbar disc bulge and spondylosis, thoracic spondylosis, migraine headaches, asthma/ chronic obstructive pulmonary disease (COPD), bipolar disorder, attention deficit hyperactivity disorder (ADHD), major depressive disorder, generalized anxiety disorder, borderline intellectual functioning, learning disorder, and a personality disorder.

*Id.* In so concluding, the ALJ also discounted some of Plaintiff's alleged impairments, including schizophrenia, PTSD, and any medically determinable cardiac disorder because these impairments were not established in any records or medical documentation. (R. 18).

At Step Three of the analysis, the ALJ concluded that none of Plaintiff's impairments met or exceeded one of the listed impairments in 20 C.F.R. Part 404, Subpt P, Appendix 1. *Id.* The

ALJ referenced Plaintiff's MRFC assessment conducted by Dr. Rebecca Billings in 2011, and the psychological evaluation conducted by Dr. Byron Hillin, in 2009, marked as Exhibits 1F and 3F, respectively, in his analysis. (R. 21).

At Step Four, "after considering the entire record," the ALJ concluded that Plaintiff was limited to the following residual functional capacity (RFC):

> Claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) except she can never climb a ladder, rope, or scaffold; can never crawl; can only occasionally climb ramps or stairs; can only occasionally balance, stoop, kneel, or crouch; must avoid concentrated exposure to heights, dangerous machinery, and like workplace hazards; is limited to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks; is limited to no work related contact with the public, only occasional and superficial interaction with co-workers, and no more than occasional supervision; and is limited to a low stress work environment, which means no production rate pace work, but, rather, goal oriented work with only occasional and routine change in work setting.

(R. 21). In his assessment of Plaintiff's RFC, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, but that her testimony and statements regarding the persistence and limiting effects of those symptoms were not entirely credible. *Id.*

In supporting his determination of Plaintiff's physical limitations, the ALJ cited to medical records from Plaintiff's time in prison, records from her trips to the emergency room, and records from her primary care physicians. (R. 22-23). The ALJ "gave particular consideration" to Plaintiff's potential exertional, postural, and respiratory limitations, on the basis of her physical impairments, including obesity. (R. 24).

The ALJ also took into account medical opinion evidence in making his RFC determination for Plaintiff's physical limitations. He gave the December 2011 assessment conducted by James Caramanna, M.D., a state medical consultant, some weight as it was fairly

consistent with the record. (R. 24). However, contrary to Dr. Caramanna's opinion that Plaintiff had no disabling physical impairment, the ALJ limited Plaintiff to sedentary work because of her later treatment for back pain and respiratory conditions. *Id.*

In determining Plaintiff's mental limitations, the ALJ considered her prison records, treatment notes from Dr. McGavin, and records from Stairways Behavioral Health, including Dr. Su's treatment notes. The ALJ noted that Plaintiff's prison records indicated that her GAF scores were "consistently listed as 55 or more generally as 51-70." (R. 24, 27). The ALJ gave these scores, and the prison records in general, great weight based on Plaintiff's consistent treatment in prison. (R. 27). The treatment records prepared by Dr. McGavin, plaintiff's treating psychiatrist at Renewal from June to September 2011, indicated that Plainitff had some problems with stress, anxiety, and depression, and that her GAF score was 40-45. (R. 24). However, the ALJ also noted that Dr. McGavin worried about "suspected exaggeration" and "considerable distortion." (R. 25). The ALJ noted records from Stairways Behavioral Health, which indicated that Plaintiff had mood stability issues, but had intact memory and an average intelligence. (R. 25-26).

The ALJ also considered opinion evidence regarding Plaintiff's mental impairments. The ALJ gave great weight to an MRFC assessment conducted by Dr. Billings as it was consistent with the record. The ALJ explained that he gave Plaintiff "quite restrictive mental limitations" in his assessment of her RFC based on Dr. Billings' report. (R. 26-27).

The ALJ gave little weight to Dr. Link's MRFC assessment, which concluded that Plaintiff could meet the mental demands of sustained work, because she neither examined the Plaintiff directly nor had access to her recent records. (R. 27).

The ALJ also gave little weight to the medical source statement prepared by Dr. Sean Su, which indicated Plaintiff had "extreme" limitations. (R. 27). The ALJ explained that Dr. Su's

report lacked objective support and was inconsistent with Plaintiff's medical records and Dr. Su's own assignment of a GAF score of 50. The ALJ also noted that Plaintiff's treatment relationship with Dr. Su was much shorter than her treatment relationship with her caregivers in prison. (R. 27-28).

The ALJ concluded his analysis at Step Four with a summation of the manner in which he included Plaintiff's impairments into his RFC assessment:

> After a careful review of the evidence, I find that the exertional and postural limitations of the above residual functional capacity assessment address the claimant's back disorder, obesity, and breathing disorders, in combination. The limitations on exposure to respiratory irritants further account for her asthma and COPD. Limits on exposure to workplace hazards account for pain distraction from her back, GERD, and migraines, as well as any potential relapse into drug or alcohol abuse. Limiting the claimant to simple tasks addresses borderline intellectual function, learning disorder, ADHD, and distraction from depression. Restrictions on social interaction account for bipolar disorder mood swings and personality disorder. Restricting her to low stress work further addresses the claimant's anxiety disorder, ADHD, and borderline intellectual functioning.

(R. 28).

Because the ALJ concluded that Plaintiff had no past relevant work, he proceeded to Step Five. The ALJ determined that Plaintiff was a younger individual according to 20 C.F.R. § 416.963 and that she had a limited education according to 20 C.F.R. § 416.964. (R. 29). He also sought the assistance of a vocational expert in evaluating the existence of suitable work in the national economy. In response to the ALJ's hypothetical question containing Plaintiff's RFC, s*ee infra* 5-6, the vocational expert testified that an individual with Plaintiff's limitations would be able to perform at least three jobs in the national economy: assembler, DOT No. 734.687-018; table worker, DOT No. 739.687-182; and surveillance monitor, DOT No. 379.687-010. (R. 74). As a result of these findings, the ALJ concluded that Plaintiff was not disabled. (R. 30).

Plaintiff requested a review of the decision from the Appeals Council, which subsequently denied her request. (R. 3-6). The ALJ's decision thus became the final decision of the Commissioner. *Id.*

## III. Legal Analysis

### A. Standard of Review

To qualify for disability under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. §423(d)(1). This evaluation requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or exceeds the requirements of a listed impairment, (4) has the ability to return to his or her past relevant work, or, (5) if not, whether he or she can perform other work. *See* 20 C.F.R. §404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

If the claimant is unable to resume previous employment, the burden shifts to the Commissioner to prove that, given the claimant's mental or physical limitations, age, education, and work experience, she can still perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986); *see also Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002). "The Commissioner uses the RFC assessment, [20 C.F.R.] § 404.1520(e), and the testimony of vocational experts and specialists, *Id.* § 404.1566(e); 416.966(e), to make this determination." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014). "'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of

performing work in the national economy.'" *Id.* (quoting *Provenzano v. Comm'r*, Civil No. 10–4460(JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g), 1383(c)(3); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Hagans v. Comm'r of Soc. Sec.*, 694 F. 3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Id.* (citing *Fargnoli*, 247 F. 3d at 38); 42 U.S.C. § 405(g). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, even where this court acting *de novo* might have

reached a different conclusion, "so long as the agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. CnR. v. Sebelius*, 566 F. 3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. CnR. v. Heckler*, 806 F. 2d 1185, 1191 (3d Cir. 1986)).

**B.      Discussion**

Plaintiff challenges the ALJ's determination that she is not disabled on three grounds: (1) the ALJ ignored Social Security Regulations in evaluating the evidence contained in the record, specifically Dr. Billings' mental status examination; (2) the ALJ improperly discounted the opinion of Dr. Su; and (3) the ALJ failed to discuss significant, probative evidence that supports a finding of disability.[2] For her part, the Commissioner claims that the Administrative Law Judge (ALJ) considered and assigned appropriate weight to all of the evidence in the record, including treating source opinions and Plaintiff's own testimony regarding her limitations.

For the reasons that follow, the Court concludes that the ALJ properly considered and evaluated the evidence in the record and that his disability determination was supported by substantial evidence. The Court will therefore affirm the ALJ's decision.

**1.      The Application of Social Security Ruling 85-15 to the Evaluation of Dr. Billings' Report**

Plaintiff claims that the ALJ was obligated to find that she was disabled based on his acceptance of Dr. Billings' restrictive assessment of her mental functions as "well-reasoned." (R. 13). In making this argument, Plaintiff relies heavily on Social Security Ruling (SSR) 85-15, as cited, in part:

---

[2] The Court notes that counsel for Plaintiff nominally divided her argument into two claims. However, the first of these encompassed two distinct arguments. Therefore, the Court has divided Plaintiff's first claim into its two logical components, as stated above.

Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. *A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability* because even favorable age, education, or work experience will not offset such a severely limited occupational base [. . .]. The reaction to the demands of work (stress) is highly individualized.

Pl.'s Br., ECF No. 9 at 11-12 (quoting SSR 85-15) (emphasis added by Plaintiff). The Court finds no merit in this argument.

Social Security Ruling 85-15 "clarifies policies applicable in cases involving the evaluation of *solely non-exertional impairments*," when the medical-vocational guidelines would otherwise fail to direct a conclusion of disabled or not disabled.[3] SSR 85-15 at 1-2 (emphasis added).

*Non-exertional impairments* are "restrictions imposed by [a claimant's] impairments and related symptoms, such as pain, [which] affect only [a claimant's] ability to meet the demands of

---

[3] The Secretary of Health and Human Services promulgated medical-vocational guidelines—also known as "grids"—in order to improve the consistency and uniformity of disability determinations. *Heckler v. Campbell*, 461 U.S. 458, 462 (1983). "[The medical-vocational guidelines] consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Id.* These guidelines do not apply, however, "if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of a rule." 20 C.F.R. § 404.1569; *Sykes v. Apfel*, 228 F.3d, 259, 270 (3d Cir. 2000) ("the [medical-vocational guidelines] apply only to 'an issue that is not unique to each claimant.'"). Where the guidelines do not apply, the Commissioner may choose how best to make the disability determination. *See* 20 C.F.R. § 404.1566(e) ("[The Commissioner] will decide whether to use a vocational expert or other specialist" if presented with a "complex issue" in disability determination).

jobs other than strength demands. 20 C.F. R. § 404.1569a(c)(1). *Exertional impairments* are those affecting a claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b); *see Sykes,* 228 F.3d at 263. Mental impairments are typically categorized as non-exertional impairments. SSR 85-15 at 2. In complex cases—those involving a combination of exertional and non-exertional impairments, for example—SSR 85-15 directs the Commissioner to enlist the support of "vocational resources," including vocational experts in making their disability determination, but does not necessarily dictate a particular finding. *Id.* at 3.

This case involves a claimant with more than non-exertional impairments. Indeed, the ALJ concluded at Step Two that Plaintiff suffered multiple impairments, some exertional and others non-exertional, some mental and others physical. (R. 17). Plaintiff's impairments are thus beyond the scope of SSR 85-15, rendering it inapplicable to this case.

Assuming, *arguendo*, that SSR 85-15 governed this case, the ALJ would still not be bound to find Plaintiff disabled based on Dr. Billings' report, who generally assessed Plaintiff's mental limitations as "slight" or "moderate." (R. 612). Dr. Billings also found that Plaintiff had "marked" limitations in her ability to respond appropriately to work pressures in a usual work setting. *Id.* Yet, none of these findings are serious enough to direct a finding of disability.[4] Moreover, given the complex and individualized nature of Plaintiff's non-exertional limitations, SSR 85-15 would have directed the ALJ to seek the assistance of a vocational expert before making his determination. *See* SSR 85-15 at 3. The ALJ's reliance on a vocational expert would

---

[4] Dr. Billing's conclusions were based on a scale commonly used to measure the severity of a claimant's limitations. This scale ranges from "none" to "slight" or "mild" to "moderate" to "marked" to "extreme." 20 C.F.R. § 416.920a(c)(4). The "extreme" notation represents "a degree of limitation that is incompatible with the ability to do any gainful activity" and would thus, strongly support a finding of disability. *Id.* "Marked" and "moderate" limitations generally support the conclusion that a claimant has a severe impairment, *see* 20 C.F.R. § 416.920a(d)(1), but this conclusion does not direct a finding of disability, *see id* at § 416.920a(d)(2)-(3). It does, however, warrant further assessment of claimant's limitations. *Id.*

have comported with the policy recommended by the SSR 85-15 had it applied and is therefore proper.

Thus, the Court finds that the ALJ was not bound by SSR 85-15 to conclude that Plaintiff was disabled based on Dr. Billings' report.

### 2. The Consideration of Dr. Su's Medical Source Statement and Plaintiff's GAF Scores

Plaintiff next claims that the ALJ improperly discounted the opinions of Dr. Sean Su, one of Plaintiff's treating physicians. In particular, she claims that the ALJ wrongly discounted Dr. Su's findings based solely on Plaintiff's inconsistent treatment, and an apparent inconsistency between Dr. Su's conclusion that Plaintiff had "extreme" limitations and his assertion that her GAF score was 50. In any event, Plaintiff claims that her GAF scores support a finding of disability. The Commissioner responds that the ALJ appropriately discounted Dr. Su's opinion.

The Commissioner generally gives more weight to medical evidence generated by a claimant's treating or examining physician. *See* 20 C.F.R. § 404.1527(c)(1)-(2); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) ("An ALJ should give treating physicians' reports great weight" especially when based on "continuing observation" over a "prolonged period of time.") (quoting *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000)). Indeed, a treating physician's opinion is entitled to "controlling weight," when it is founded upon "medically acceptable, clinical, and laboratory diagnostic techniques" and is not contradicted by other evidence in the record. 20 C.F.R. § 404.1527 (c)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). However, an ALJ is entitled to reject a treating source's opinion, but cannot do so "for no reason or the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

In this regard, the United States Court of Appeals for the Third Circuit has found that an ALJ is prohibited from discounting treating source opinions based solely on her "credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429); *see Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983) (holding that ALJ erred in relying on "amorphous impressions, gleaned from the record and from his evaluations of [claimant's] credibility"). This rule is especially acute in cases involving a medically substantiated disability. *Morales,* 225 F.3d at 319. Rather, an ALJ must take into consideration several factors when discounting a treating source opinion, including the nature and length of the treatment relationship, the opinion's objective support, its consistency with the record, the specialization of the treating source, and other factors that the parties bring to the ALJ's attention. 20 C.F.R. § 404.1527(c)(2)-(6); *see also Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (finding treating source opinion was properly discounted where opinion was "conclusory and unsupported by the medical evidence," and was plagued by "internally contradictory evidence").

Here, the ALJ followed the regulations and applicable case law when he discounted Dr. Su's opinion. The ALJ found that Dr. Su's opinion deserved little weight for several cogent and well-supported reasons after review of the entire medical record. The ALJ noted that Dr. Su's conclusion that Plaintiff had "extreme" limitations, along with his conclusion that she would need to call off five out of five days in the work week, was inconsistent with his assigned GAF scores of 50 and the narrative entries in his treatment notes. (R. 27); *see* 20 C.F.R. §404.1527(c)(3); *Jones*, 954 F.2d at 129. The ALJ further explained that Dr. Su's opinion rested on his observation of Plaintiff's "wild mood swings," an ailment that was not documented in her prison records. (R. 27); *see* 20 C.F.R. § 404.1527(c)(4). The ALJ also found that Dr. Su's treatment relationship with Plaintiff was shorter than her relationship with her healthcare

providers in prison, due to her consistent treatment while incarcerated. (R. 27); *see* 20 C.F.R. § 404.1527(c)(2)(i). Moreover, the ALJ determined that Dr. Su's opinion was inconsistent with both Dr. Billings' report and Plaintiff's treatment records from the Bureau of Prisons, both of which documented more moderate limitations, but contained similar GAF scores. (*Compare* R. 651 *with* R. 611 *and* R. 294, 347).

"GAF scores 'are used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults."[5] *Sweeney v. Commissioner of Social Sec.*, 847 F. Supp. 2d 797, 802 (W.D. Pa. 2012) (quoting *Irizarry v. Barnhart*, 233 Fed. App'x. 189, 190 n.1 (3d Cir. 2007). GAF scores constitute "medical evidence accepted and relied upon by a medical source" and must be taken into consideration in an ALJ's decision. *Wiggers v. Astrue*, 2010 WL 1904015, at *8 (W.D. Pa. May 10, 2010). However, though indicative of a claimant's limitations, a GAF score does not establish disability. *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008) (citing *Camp v. Barnhart*, 103 Fed. App'x. 352, 354 (10th Cir. 2004) ("The [GAF] score, without evidence that it impaired [claimant's] ability to work, does not establish an impairment."); *see also* 65 Fed Reg. 5074601, 50764 (Aug. 21, 2000) (noting Commissioner does not "endorse" use of GAF scale in social security disability determinations, but that GAF scores can "provide valuable additional functional information").

---

[5] A GAF score of 41 to 50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 34 (4th ed, 2000). A GAF of 51- 60 indicates "moderate symptoms, e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships." *Id.*

Contrary to Plaintiff's claims, the GAF scores assigned by Dr. Su, Dr. Billings, or Plaintiff's caregivers from the Bureau of Prisons are not sufficient to compel the ALJ to determine that Plaintiff was disabled. *See Chanbunmy* 560 F. Supp. 2d at 383; *see also* 65 Fed. Reg. 5074601 at 50764. In this case, the Court instead finds that the ALJ appropriately factored Plaintiff's GAF scores into his decision. Specifically, the ALJ gave great weight to Dr. Billings' assigned GAF score of 50 and the GAF scores assigned to Plaintiff in prison, which generally ranged from 51-70, (R. 27), and included "quite restrictive mental limitations" in Plaintiff's RFC. (R. 26-27).

For these reasons, the Court finds that the ALJ followed the applicable regulations and the law in discounting Dr. Su's medical source opinion and in considering Plaintiff's assigned GAF scores.

### 3.    The Alleged Failure to Discuss Significant, Probative Evidence

Plaintiff lastly claims that the ALJ erred by failing to discuss exhibits 1F, 2F, and 3F and explain the weight each of these sources deserve. According to Plaintiff, these exhibits contain evidence probative of the extent of claimant's underlying conditions, and the ALJ's failure to discuss them warrants remand. This argument is not persuasive.

The Court of Appeals for the Third Circuit has long held that, in making her decision, an ALJ must provide a "clear and satisfactory explication of the basis upon which it rests," which is "as comprehensive and as analytical as possible." *Cotter v. Harris*, 642 F.2d 704, 704-05 (3d Cir. 1981); *see Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119-120 (3d. Cir. 2000) (remanding where ALJ did not provide explanation of evidence considered, rendering Step Three analysis "hopelessly inadequate"). As the *Cotter* Court explained:

> We interpret our [. . .] holding in light of our statutory function of judicial review. In this regard we need from the ALJ not only an expression of the evidence s/he

> considered which supports the result, but some indication of the evidence which
> was rejected. In the absence of such an indication, the reviewing court cannot tell
> if significant probative evidence was not credited or simply ignored.

642 F.2d at 705. This requirement is especially pertinent where the record contains significant, probative, or contradictory evidence. *Farngoli*, 247 F.3d at 41-42; *Cotter*, 642 F.2d at 706; *see Reefer v. Barnhart*, 326 F.3d 376, 382 (3d Cir. 2003) (remanding where ALJ did not discuss choice to credit some reports over others where reports were contradictory). This rule extends to the ALJ's consideration of the weight given to opinion evidence illustrating the extent of a claimant's physical and mental limitations. 20 C.F.R. § 404.1527(e)(2)(ii)(explaining evaluation of opinion evidence); § 416. 927(e)(2)(ii) (same). There is no requirement, however, that an ALJ must reference all of the evidence a claimant presents. *Johnson v. Comm'r of Soc. Sec.*, 549 F.3d 198, 204 (3d Cir. 2008); *see Fargnoli*, 247 F.3d at 42 ("[W]e do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant [as here] has voluminous medical records").

Moreover, though many district courts in the Third Circuit have found that the failure to discuss GAF scores may warrant remand, *Rivera v. Astrue*, 9 F. Supp.3d 495, 504-05 (E.D. Pa 2014) (collecting cases), remand is not appropriate when the Court finds that the ALJ did not "cherry-pick evidence or ignore medical assessments that ran counter to her finding" in the evaluation of a claimant's GAF scores. *Rios v. Commissioner of Social Sec.*, 444 Fed. App'x. 532, 535 (3d Cir. 2011).

Additionally, the Court of Appeals for the Third Circuit has held that an error does not necessarily warrant remand where the error was harmless. *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (finding ALJ's failure to consider claimant's obesity was harmless where it "would not affect the outcome of the case"). In this regard, an ALJ's failure to explicitly

discuss evidence may be harmless when the evidence is duplicative or is consistent with the ALJ's RFC analysis. *Mays v. Colvin*, 739 F.3d 569, 579 (10th Cir. 2014); *see McGraw v. Comm'r of Soc. Sec.*, 2015 WL 1951892 at *2 (3d Cir. 2015) (holding ALJ's failure to discuss medical examination report was not error where report "added nothing that the ALJ had not already taken into account").

Here, Plaintiff challenges the ALJ's failure to discuss three exhibits: 1F, which Plaintiff alleges contains evidence of her "marked limitations"; 2F, which Plaintiff identifies as containing a GAF score of 45-50; and 3F, which contains Dr. Hillin's 2009 psychological evaluation of Plainitff. Each exhibit will be addressed in turn.

Exhibit 1F contains two separate documents. (R. 211, 213). The first document is the hand-written attachment to the mental residual functional capacity (MRFC) assessment conducted by Dr. Billings (R. 212). Although it is a separate report and was, curiously, separated from Dr. Billings' full assessment contained in Exhibit 7F, (R. 604), this hand-written attachment was created on the same date as the full MRFC assessment, bears the signature of Dr. Billings, and sets forth conclusions identical to those in the full assessment. (*Compare* R. 211-212 *with* R. 612). That the ALJ devoted considerable effort to explaining the great weight he afforded Dr. Billings' assessment convinces the Court that, contrary to Plaintiff's claims, the ALJ more-than-adequately considered the information contained in the first document. The second document is a school psychologist's report from the School District of the City of Erie from 1978, when Plaintiff was in first-grade. *Id.* This report indicates the results of intelligence and grade-equivalency tests Plaintiff took in elementary school. The ALJ also specifically considered and appropriately addressed this report in his opinion at Step Three. (R. 21). Thus, the ALJ properly discussed and considered Exhibit 1F.

Exhibit 2F contains several treatment notes from 2008 to 2010 from Stairways Behavioral Health, where Drs. Gail Holland and Sean Su, among others, evaluated Plaintiff on a somewhat regular basis. Plaintiff specifically directs the Court's attention to the GAF score range of 45-50, which Dr. Holland assigned to her in 2008 (R. 257). The Court is not convinced that the ALJ committed error in failing to discuss this specific GAF score, however. The ALJ was not obligated to discuss *every* GAF score or treatment note, *see Fargnoli*, 247 F.3d at 41; *Johnson*, 549 F.3d at 204, especially one which, as here, does not conflict with other evidence in the record. Indeed, Dr. Holland's score is very similar to Dr. Billings' and the Bureau of Prisons' more recently assigned GAF scores of 50 and 55, respectively. (*Compare* R. 257 *with* R. 294, 347 *and* R. 611). Moreover, there is no indication that the ALJ "cherry picked" GAF scores in his evaluation of the record. *See Rios*, 444 Fed. App'x. at 535. The Court therefore finds that the ALJ did not commit error by excluding discussion of a single GAF score range from 2008 in his evaluation of Plaintiff's limitations.

Exhibit 3F contains Dr. Hillin's consultative psychological evaluation of Plaintiff from 2009. Though Plaintiff is correct that courts in the Third Circuit generally require ALJs to discuss medical sources such as Dr. Hillin's report, the purpose for that requirement is to enable the Court to exercise its statutory function of reviewing the Commissioner's decision for substantial evidence. *See* 20 C.F.R. § 404.1527(e)(2)(ii); 20 C.F.R. § 416.927(e)(2)(ii); *Cotter*, 642 F.2d at 705. That the ALJ specifically referenced the battery of tests that Dr. Hillin performed in evaluating Plaintiff's impairments at Step Three of the analysis, (R. 21), convinces the Court that the ALJ considered the report as part of his disability determination. Moreover, Dr. Hillin's assigned GAF score of 55 was higher than that assigned by Dr. Billings and consistent with those in Plaintiff's prison records. (*Compare* R. 264 *with* R. 294, 347 *and* R.

611). Moreover, Dr. Hillin, did not conclude that Plaintiff was disabled. Rather, Dr. Hillin opined that Plaintiff was limited to "hands-on" work, a recommendation that was similar in substance to the limitations the ALJ included in the hypothetical question posed to the vocational expert. (R. 28, 265). Thus, any error the ALJ committed in failing to discuss Exhibit 3F was harmless because it would not affect the outcome of the case. *See Rutherford*, 399 F.3d at 552-553.

For these reasons, the Court concludes that the ALJ appropriately considered all of the evidence of record and that any failure to specifically discuss exhibits 1F, 2F, or 3F, was at most harmless error.

## IV.    Conclusion

Under the Social Security regulations, a district court has three options upon review of a decision of the Commissioner that has denied a claimant's request for benefits. The Court can affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of this Court's objective review of all of the evidence in the record and for the reasons stated in this memorandum opinion, the Court finds that the ALJ supported his determination that Plaintiff was not disabled with substantial evidence.

The Court understands that Plaintiff faces many challenges as a result of her impairments and is sympathetic to the effect these challenges have on her search for gainful employment. Under the applicable standard of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that she is able to perform a limited range of

sedentary work. Accordingly, the Court will grant Defendant's motion for summary judgment.

An appropriate Order and Judgment follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LAURA PEARL WOODSBEY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **1:14-CV-285-TFM** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY**,** | ) | |
| **Defendant.** | ) | |

## ORDER OF COURT

AND NOW, this 7th day of July, 2015, in accordance with the foregoing Memorandum

Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the Motion for Summary

Judgment (ECF No. 8) filed by Carolyn W. Colvin, Acting Commissioner of Social Security, is

**GRANTED,** and the Motion for Summary Judgment (ECF No. 10) filed by Plaintiff Laura Pearl

Woodsbey is **DENIED**.

 **IT IS FURTHER ORDERED** that the Decision of the Commissioner of the Social

Security Administration is hereby **AFFIRMED**. The Clerk shall docket this case **CLOSED**.

BY THE COURT:
s/Terrence F. McVerry
Senior United States District Judge

cc:     R. Christopher Brode
        Email: brodelaw@gmail.com

        Marshall J. Piccinini
        Email: marshall.piccinini@usdoj.gov


        (via CM/ECF)